# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

EDISON LIMA, JR.

            Plaintiff,              Civil No. 12-7770
                                    (NLH/KMW)
     v.

                                      **OPINION**

AETNA LIFE INSURANCE COMPANY,
And FEDERAL EXPRESS CORPORATION
SHORT TERM DISABILITY PLAN

            Defendants.

---

Appearances:

THOMAS JOSEPH HAGNER
HAGNER & ZOHLMAN, LLC
57 KRESSON ROAD
CHERRY HILL, NJ 08034

*Attorney for Plaintiff*

ELIZABETH MARIE FONG LOW
FEDERAL EXPRESS CORPORATION
3620 HACKS CROSS ROAD
BUILDING B
2ND FLOOR
MEMPHIS, TN 38125

*Attorney for Defendants*

**HILLMAN, District Judge**

    Before the Court are plaintiff's motion for summary judgment and defendants' motion for summary judgment. For the reasons expressed below, plaintiff's motion for summary judgment

will be denied, and defendants' motion for summary judgment will be granted.

## I.    BACKGROUND

Plaintiff, Edison Lima, Jr., was employed by Federal Express Corporation ("FedEx") and was a participant in the Federal Express Corporation Short Term Disability Plan ("the Plan").  Aetna Life Insurance Company, ("Aetna"), is the claims paying administrator of the Plan.  As of November 2011, Mr. Lima was employed as a "courier/DOT" for Federal Express.  The physical demand of plaintiff's workplace is described as "heavy."  The job requirements involve delivery and pickup of packages, including loading and unloading the vehicle as well as cleaning, washing and performing minor maintenance on the vehicle.  The job requires the ability to lift 75 lbs. as well as the ability to maneuver packages of any weight above 75 lbs. with appropriate equipment and/or assistance from another person.  Plaintiff last worked for FedEx on October 31, 2011.

Plaintiff states that he began suffering from severe bronchial asthma in late October 2011 and began treating with Dr. Cornelius Toma.  In a letter dated December 1, 2011, Dr. Toma stated that plaintiff was seen on November 3, 2011 and reported being "very sick for one week with severe sinus congestion, headaches and a productive cough."  Dr. Toma also stated that on November 3, 2011 plaintiff had "marked

2

inflammation of the oropharynx, inflammation of the right

tympanic membrane with few rhonchi."  Dr. Toma also saw

plaintiff on November 11, 2011 for "severe headaches in the left

frontal area." Dr. Toma recommended that plaintiff "remain off

work from November 1, 2011 thru present, [December 1, 2011]" and

be reevaluated on December 16, 2011 "for a return to work date."

On November 14, 2011, plaintiff submitted a claim for

short-term disability benefits from the Plan.

On November 20, 2011, plaintiff was seen at the St. Francis

Medical Center emergency room and was given a diagnosis of

bilateral knee pain and osteoarthritis (degenerative joint

disease).  Plaintiff was prescribed Toradol[1] and UltRAM[2] every

six hours as needed.  Plaintiff was supplied with a "work/school

release" from St. Francis Medical Center stating that plaintiff

was seen in the emergency department on November 20, 2011, and

should be excused from work due to illness or injury, and could

return to work on November 28, 2011.

On December 13, 2011, plaintiff was seen by Dr. James

Zaslavsky of Mercer Bucks Orthopedics, who noted plaintiff's

---

[1] Toradol is a nonsteroidal anti-inflammatory drug.  See
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693001.html.

[2] UltRAM is used to relieve moderate to moderately severe pain,
and is in a class of medications called opiate (narcotic)
analgesics.  See
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html

bilateral knee pain and lumbar tenderness and pain.  Dr.
Zaslavsky's examination of plaintiff's lumbar spine showed
"severe tenderness to palpation over the lower lumbar spine at
the L5-S1 level;" increasing pain with forward and backward
bending; but ability to stand with good spinal alignment in the
sagittal and coronal plane.  Dr. Zaslavsky states that
plaintiff's right knee showed tenderness to palpation medially
and laterally at the joint line; tenderness to palpation over
the superior pole of his patella; "very mild, maybe a trace
amount of swelling," and that "examination of the left knee
showed lateral joint line pain and tenderness to palpation, and
"popping and clicking under the patella with range of motion".
Dr. Zaslavsky reported reviewing x-ray imaging of both of
plaintiff's knees showing "significant tricompartmental
arthritis."

On December 17, 2011, an MRI was performed on both of
plaintiff's knees.  Plaintiff's left knee MRI report indicated
severe medial compartment degenerative joint disease, marked
chondromalacia, subcortical edema, a markedly abnormal medial
meniscus, and patellar tendenosis.  The right knee MRI report
showed medial compartment degenerative joint disease.  A
December 19, 2011 lumbar spine MRI showed minimal annular
bulging at L1-L2 and L2-L3; L4-L5 facet joint osteoarthritis;
and disc degeneration with annular bulging.

Plaintiff was seen by Dr. Zaslavsky on December 27, 2011, with continued complaints of knee and back pain. Dr. Zaslavsky reviewed the MRI imaging of plaintiff's left knee, right knee and lumbar spine. Dr. Zaslavsky stated that plaintiff's lumbar MRI showed "small disc protrusion on the left side affecting the left L5 nerve root" and that plaintiff's knee MRIs showed "severe wear" medially with "medial meniscal tears that are more degenerative in nature." Dr. Zaslavsky stated that plaintiff can do physical therapy for his back and knees, recommended bilateral knee cortisone injections, and prescribed the pain medication, Tramadol.

Plaintiff was seen again by Dr. Zaslavsky on January 6, 2012. Plaintiff reported that his back felt "much better" and his left knee was "much improved" after using Tramadol, and that he could go up and down stairs "a little easier than usual," but that the right knee "still tends to lock and click in certain positions." Dr. Zaslavsky noted "good strength" in plaintiff's right knee, but injected plaintiff's left knee with cortisone and gave him a refill of Percocet "which he will use sparingly, at most once a day" as well as UltRAM. He also prescribed physical therapy for both knees.

By letter dated January 20, 2012, plaintiff's claim for short-term disability benefits for an occupational disability beginning November 8, 2011 was denied. The denial letter did

not mention Dr. Zaslavsky or plaintiff's knee MRI reports.  The

letter notified plaintiff of the information reviewed and

informed him that based upon a review of the documentation

submitted, "the documentation fails to support a functional

impairment that would preclude you from performing the essential

functions of your heavy occupation as Courier/DOT."  Plaintiff

was informed of his right to appeal the decision and to submit

documentation indicating he was on an approved leave of absence,

along with "medical documentation that clearly states the

significant objective findings that substantiate a disability"

beginning November 8, 2011.

Plaintiff was again seen by Dr. Zaslavsky on January 24,

2012.  At that office visit, plaintiff reported improvement in

both knees, but had continued low back pain and left knee

tenderness.  Dr. Zaslavsky reported "improved range of motion in

both knees" and prescribed physical therapy three times a week

for four weeks for plaintiff's knees.  Dr. Zaslavsky stated that

plaintiff should not work for three weeks, at which time he

would be reevaluated.

On January 27, 2012, Dr. Toma completed a Certification of

Health Care Provider for Employee's Serious Health Condition

(FMLA) form.  Dr. Toma stated that he treated plaintiff on

November 3rd, 11th, 18th and December 16th, all in 2011, and that

plaintiff was unable to perform any of his job functions due to

his condition.

Dr. Zaslavsky released plaintiff to return to work on February 17, 2012 with the following restrictions: no heavy lifting at work – light duty, and sitting and standing is limited to 30 minutes at a time.

A February 3, 2012 progress note by Dr. Toma stated that plaintiff complained of low back pain since 2000 that did not radiate to his lower extremities; "severe pain in both knees since 2007;" bilateral meniscal degeneration and severe arthritis; need for bilateral total knee replacements; clear lungs with normal heart sounds; negative straight leg raises bilaterally to 60 degrees; and 2+ bilateral deep tendon reflexes.

By letter dated April 6, 2012, Aetna denied plaintiff's appeal because of "a lack of significant objective findings to substantiate a claim under the Plan." Aetna obtained five peer review physician reports from three doctors: Dr. Wendy Weinstein (January 9, 2012), Dr. Dennis Mazal (February 15, 2012 and March 3, 2012), and Dr. Martin Mendelssohn (February 15, 2012 and March 6, 2012). The April 6, 2012 final denial letter mentioned plaintiff's treatment with Dr. Zaslavsky; identified medications that had been prescribed for plaintiff, including Percocet; noted MRIs performed on both knees with a finding of "degenerative changes bilaterally;" noted plaintiff's knee pain

and tenderness; and recited the lumbar MRI finding of a "mild annular bulging at L1-L4, osteoarthritis of L4-5, and disc degeneration with annular bulging of L5-S1."

Defendants state that other facts considered in the denial of benefits were that plaintiff had been released to return to work with no restrictions on several different dates: November 14, 2011, November 21, 2011, November 28, 2011, and December 20, 2011.  Defendants also assert that plaintiff did not submit the x-ray imaging in support of his claim for short-term disability benefits from the Plan.  In addition, defendants argue that the MRIs taken of plaintiff's knees and lumbar spine also showed minor conditions.  Defendants state that plaintiff's December 17, 2011 MRI of right knee indicated only: small "suspected" surface tear of the posterior horn; intact medial collateral ligament; minimal marginal spur formation; intact lateral meniscus and ligamentous complex with minimal chondromalacia and marginal spur formation; intact ACL and PCL ligaments; normal patellofemoral cartilage; normal bone marrow; intact quadriceps and patellar tendons; small effusion; no popliteal fossa cyst. Likewise, defendants assert that plaintiff's left knee MRI report also indicated a normal patellofemoral joint, small to moderate joint effusion; marginal spur formation; slightly irregular anterior horn; intact medial ligamentous complex, the ACL, the PCL, and the distal quad tendon; mild patellar

tendinosis and prepatellar swelling; normal lateral meniscus compartment; intact lateral ligamentous complex; and normal bone marrow. Defendants further assert that the left knee MRI report specifically noted that the medial meniscus horn is not identified, but that it could be due to a previous surgical meniscectomy or due to meniscal degeneration.

Finally, defendants assert that plaintiff's December 19, 2011 MRI of his lumbar spine showed only mild conditions: normal bone marrow signal and alignment; disc desiccation and loss of height at L1-2, L2-3, L3-4, and L5-S1; no compression fracture; normal conus medullaris; no sign of bone destruction; minimal annular bulge at L1-2; mild annular bulge at L2-3; normal canal dimensions; patent foramina; mild diffuse annular bulge at L3-4 with no central canal or foraminal compromise; unremarkable L4-5 with facet joint osteoarthritis and normal canal and foramina dimensions; left-sided foraminal stenosis at L5-S1 with a mild diffuse annular bulge and facet joint osteoarthritis.

Following the denial of his appeal for benefits, plaintiff filed a civil action under Section 502(a) of the Employee Retirement Income Security Act ("ERISA") of 1974, 29 U.S.C. § 1132(a)(1)(B). Plaintiff filed a motion for summary judgment arguing that defendants' review was arbitrary and capricious. Defendants filed a motion for summary judgment arguing the denial of benefits was not arbitrary and capricious, Aetna is

9

not a proper party, and plaintiff's state law claim is preempted by ERISA.  Both motions are before the Court.

## II. JURISDICTION

The Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Specifically, this matter arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, as amended.

## III. STANDARD OF REVIEW

Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and

all justifiable inferences are to be drawn in his favor.'"
Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)
(citing Anderson, 477 U.S. at 255).

Initially, the moving party bears the burden of
demonstrating the absence of a genuine issue of material fact.
Celotex, 477 U.S. at 323 ("[A] party seeking summary judgment
always bears the initial responsibility of informing the
district court of the basis for its motion, and identifying
those portions of 'the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any,' which it believes demonstrate the absence
of a genuine issue of material fact." (citation omitted); see
also Singletary v. Pa. Dept. of Corr., 266 F.3d 186, 192 n.2 (3d
Cir. 2001) ("Although the initial burden is on the summary
judgment movant to show the absence of a genuine issue of
material fact, 'the burden on the moving party may be discharged
by "showing" -- that is, pointing out to the district court --
that there is an absence of evidence to support the nonmoving
party's case' when the nonmoving party bears the ultimate burden
of proof.") (citing Celotex, 477 U.S. at 325).

Once the moving party has met this burden, the nonmoving
party must identify, by affidavits or otherwise, specific facts
showing that there is a genuine issue for trial. Celotex, 477
U.S. at 324. A "party opposing summary judgment may not rest

11

upon the mere allegations or denials of the ... pleading[s.]"
Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001)
(internal quotations omitted).  For "the non-moving party[] to
prevail, [that party] must 'make a showing sufficient to
establish the existence of [every] element essential to that
party's case, and on which that party will bear the burden of
proof at trial.'"  Cooper v. Sniezek, 418 F. App'x 56, 58 (3d
Cir. 2011) (citing Celotex, 477 U.S. at 322).  Thus, to
withstand a properly supported motion for summary judgment, the
nonmoving party must identify specific facts and affirmative
evidence that contradict those offered by the moving party.
Anderson, 477 U.S. at 256-57.

## IV.  DISCUSSION

### A.  Standard of Review under ERISA

There is no dispute that the Plan meets the test to qualify
as an ERISA plan.  ERISA provides that a plan participant or
beneficiary may bring a suit "to recover benefits due to him
under the terms of his plan, to enforce his rights under the
terms of the plan, or to clarify his rights to future benefits
under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  The
statute, however, does not specify a standard of review for an
action brought pursuant to § 1132(a)(1)(B).  Firestone Tire &
Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989).  The Supreme
Court held that "a denial of benefits challenged under

12

§ 1132(a)(1)(B) is to be reviewed under a *de novo* standard
unless the benefit plan gives the administrator or fiduciary
discretionary authority to determine eligibility for benefits or
to construe the terms of the plan." Id. at 115. When the plan
affords the administrator with discretionary authority, courts
must review the benefit decision for an abuse of discretion.
Conkright v. Frommert, 559 U.S. 506, 517 130 S.Ct. 1640, 1649
(2010) (affirming deferential standard of review to the plan
administrator); see Howley v. Mellon Fin. Corp., 625 F.3d 788,
793 n.6 (3d Cir. 2010) (explaining that courts in this Circuit
have referred to this standard of review as "abuse of
discretion" or "arbitrary and capricious" - these standards of
review are essentially identical and the terms are
interchangeable).

   The parties agree that the abuse of discretion/arbitrary
and capricious standard applies to this case because the Plan
gives the plan administrator discretionary authority to decide
eligibility benefits or interpret terms of the Plan.

   **B.  Abuse of Discretion Analysis**

   Under the abuse of discretion standard of review, "the
Court's role is not to interpret ambiguous provisions *de novo*,
but rather to 'analyze whether the plan administrator's
interpretation of the document is reasonable.'" Connor v.
Sedgwick Claims Management Services, Inc., 796 F. Supp. 2d 568,

580 (D.N.J. 2011) (quoting Bill Gray Enters. Inc. Employee and
Health Welfare Plan v. Gourley, 248 F.3d 206, 218 (3d Cir.
2001)) (other citation omitted).  A decision is considered
arbitrary and capricious "if it is without reason, unsupported
by substantial evidence or erroneous as a matter of law."
Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 45 (3d Cir.
1993).

To determine whether a plan administrator abused its
discretion, the Court must focus "on how the administrator
treated the particular claimant."  Miller v. Am. Airlines, Inc.,
632 F.3d 837, 845 (3d Cir. 2011) (quoting Post v. Hartford Ins.
Co., 501 F.3d 154, 162 (3d Cir. 2007)).  "Specifically, in
considering the process that the administrator used in denying
benefits, we have considered numerous irregularities to
determine whether . . . the administrator has given the court
reason to doubt its fiduciary neutrality."  Id. (internal
quotations omitted).  This is accomplished "by taking account of
several different, often case-specific, factors, reaching a
result by weighing all together."  Id. (quoting Metropolitan
Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008)).

The scope of a court's review is narrow, however, and the
court "is not free to substitute its own judgment for that of
the plan administrator in determining eligibility for plan
benefits."  Connor, 796 F. Supp. 2d at 579 (quotation omitted).

14

Thus, the plaintiff retains the burden to prove that he is entitled to benefits, and that the plan administrator's decision was arbitrary and capricious.

### C. Plaintiff's Motion for Summary Judgment

Plaintiff argues that defendants' denial of his benefits under the Plan was arbitrary and capricious because (1) it constitutes a self-serving selective reading of the record; (2) conclusions without explanation do not allow for effective review; and (3) it failed to consider the narcotic effects of plaintiff's prescribed medications.

#### 1. Reading of the Record

ERISA plan administrators need not give special deference to the opinions of treating physicians, and are under no "discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Plan administrators may properly credit one physician's opinion over that of another. Witte v. Connecticut Gen. Life Ins. Co., No. 06-2755, 2007 U.S. Dist. LEXIS 89720, 2007 WL 4300224, at *16 (D.N.J. Dec. 6, 2007) (citations omitted). However, an administrator may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians." Nord, 538 U.S. at 834. "As a corollary principle, the selective, self-serving

15

use of medical information is evidence of arbitrary and
capricious conduct." Moskalski v. Bayer Corp., No. 06-568, 2008
WL 2096892, at *9 (W.D.Pa. May 16, 2008) (citing Porter v.
Broadspire and Comcast Long Term Disability Plan, 492 F.Supp.2d
480, 491 (W.D.Pa. 2007); Petroff v. Verizon N., Inc., No. 02-
318, 2004 WL 1047896, at *41 (W.D.Pa. May 4, 2004)).

        Defendants did not perform a self-selective review of the
record.  When plaintiff submitted his claim for short-term
disability benefits from the Plan on November 14, 2011, he
suffered from a sinus infection.  Although a few days later, on
November 20, 2011, he sought treatment for his knees and back at
the St. Francis Medical Center emergency room and was diagnosed
with bilateral knee pain and osteoarthritis (degenerative joint
disease) he did not see Dr. Zaslavsky until over a month later
and after he had been cleared to return to work.  Plaintiff's
assertion that Aetna failed to consider reports from Dr.
Zaslavsky and his MRIs distorts the procedural history of the
claim it reviewed.  Aetna's initial determination was made on
records related to the claim of disability as of November 8th, a
date before any treatment for back and knee problems.  It is
almost as if Plaintiff filed for disability and then sought
diagnosis and treatment to support the claim.

        Regardless, on appeal, Aetna commented on all the MRIs and
doctors' reports submitted by plaintiff.  The April 6, 2012

final denial letter mentioned plaintiff's treatment with Dr. Zaslavsky and identified medications that had been prescribed for plaintiff, including Percocet. Aetna noted the MRIs performed on both knees with a finding of "degenerative changes bilaterally;" noted plaintiff's knee pain and tenderness; and recited the lumbar MRI finding of a "mild annular bulging at L1-L4, osteoarthritis of L4-5, and disc degeneration with annular bulging of L5-S1."

Aetna concluded, nonetheless, based on a review of the medical records by other physicians that the MRIs taken of plaintiff's knees and lumbar spine showed only minor conditions. Aetna concluded that plaintiff's December 17, 2011 MRI of right knee indicated only: small "suspected" surface tear of the posterior horn; intact medial collateral ligament; minimal marginal spur formation; intact lateral meniscus and ligamentous complex with minimal chondromalacia and marginal spur formation; intact ACL and PCL ligaments; normal patellofemoral cartilage; normal bone marrow; intact quadriceps and patellar tendons; small effusion; no popliteal fossa cyst. Likewise, defendants assert that plaintiff's left knee MRI report also indicated a normal patellofemoral joint, small to moderate joint effusion; marginal spur formation; slightly irregular anterior horn; intact medial ligamentous complex, the ACL, the PCL, and the distal quad tendon; mild patellar tendinosis and prepatellar

swelling; normal lateral meniscus compartment; intact lateral ligamentous complex; and normal bone marrow. Aetna further concluded that the left knee MRI report specifically noted that the medial meniscus horn is not identified, but that it could be due to a previous surgical meniscectomy or due to meniscal degeneration.

Aetna also concluded that plaintiff's MRI of his lumbar spine showed only mild conditions: normal bone marrow signal and alignment; disc desiccation and loss of height at L1-2, L2-3, L3-4, and L5-S1; no compression fracture; normal conus medullaris; no sign of bone destruction; minimal annular bulge at L1-2; mild annular bulge at L2-3; normal canal dimensions; patent foramina; mild diffuse annular bulge at L3-4 with no central canal or foraminal compromise; unremarkable L4-5 with facet joint osteoarthritis and normal canal and foramina dimensions; left-sided foraminal stenosis at L5-S1 with a mild diffuse annular bulge and facet joint osteoarthritis.

In addition, Aetna took into consideration that plaintiff had been released to return to work with no restrictions on several different dates: November 14, 2011, November 21, 2011, November 28, 2011, and December 20, 2011.

The Plan requires significant objective medical findings, not just self-reported symptoms, or complaints of pain. Here, Aetna did a comprehensive review of the information submitted by

18

plaintiff and arrived at the conclusion that plaintiff's complaints were mainly of self-described pain and that there was a lack of significant objective findings to substantiate a claim under the Plan. Although plaintiff's treating physicians opined differently as to the severity of plaintiff's condition, Aetna is permitted to credit one physician's opinion over that of another. Even if there is evidence in the record to suggest an alternative conclusion, the Court cannot substitute its own judgment for that of the plan administrator. See Connor, 796 F. Supp. 2d at 579. The standard applied is whether the plan administrator's decision was arbitrary and capricious. Here, Aetna provided a reason for its denial, and supported its conclusion with reference to the plaintiff's medical records, as well as peer review reports. Therefore, there is no evidence that Aetna's decision was either arbitrary or capricious.

### 2. Effective Review

Aetna's denial of plaintiff's STD benefits was adequately explained. A review of the denial letters reveals that Aetna summarized and referenced the medical records submitted by the plaintiff. Aetna also relied on five peer review reports submitted by three different physicians: Dr. Wendy Weinstein (January 9, 2012), Dr. Dennis Mazal (February 15, 2012 and March 3, 2012), and Dr. Martin Mendelssohn (February 15, 2012 and March 6, 2012). These peer reviews concluded that there was no

clinical documentation of a functional impairment that would preclude plaintiff from performing his occupation, and that there was no documentation that the medications prescribed to plaintiff would cause any significant side effects or adverse reactions impacting plaintiff's ability to work.

Although Aetna's final decision does not provide an explanation of why the opinion of plaintiff's treating physicians was rejected, Aetna is under no "discrete burden of explanation [if it credits] reliable evidence that conflicts with a treating physician's evaluation." See Nord, 538 U.S. at 834. Aetna does not have to give any special deference to the opinions of treating physicians, and if it chooses to rely on conflicting peer reviews or other medical opinions, it may do so. See Nord, 538 U.S. at 834.

Therefore, Aetna provided adequate information in reaching its conclusions so that the decision to deny STD benefits was neither arbitrary nor capricious.

### 3. Narcotic Effect

Finally, plaintiff argues that defendants failed to consider the effects of his prescribed medications, particularly Percocet and Tramadol, when they denied his STD benefits. Defendants respond that these are pain medications and none of the treating physicians opine that the medications themselves are disabling.

The medical reports submitted by plaintiff do not contain opinions about the effects of his medications related to his job responsibilities.  While the side effects of certain narcotics may affect driving a truck, this Court cannot make a medical determination about the side effects of a particular drug in place of the plan administrator.[3]  See Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of America, Inc., 222 F.3d 123, 129 (3d Cir. 2000) ("[A] court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.") (citations omitted).  Thus, based on the medical information before the plan administrator, it was not an abuse of discretion for Aetna to deny benefits on the ground that plaintiff was taking Percocet and Tramadol.

**D.  Defendants' Motion for Summary Judgment**

Defendants also filed a motion for summary judgment arguing that (1) Aetna is an improper party and should be dismissed; (2)

---

[3] The side effects for Oxycodone (Percocet is the brand name that contains Acetaminophen and Oxycodone) may include nausea, vomiting, loss of appetite, constipation, dry mouth, dizziness or lightheadedness, drowsiness, flushing, sweating, itching, weakness, headache, mood changes, narrowing of the pupil (dark circle in eye), red eyes, fast or slow heartbeat, difficulty breathing, slowed breathing, hives, rash, swelling of the face, throat, tongue, lips, eyes, hands, feet, ankles, or lower legs, hoarseness, difficulty swallowing, and seizures.  See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html. Some of the possible side effects listed appear antithetical to responsible driving.

the denial of STD benefits was not arbitrary and capricious; and (3) plaintiff's state law claim is preempted by ERISA. The Court has already addressed defendants' second argument above. Defendants other two arguments are addressed below.

**1. Aetna as Plan Administrator**

Defendants argue that Aetna should be dismissed because plaintiff's cause of action lies only against the Plan, and that Aetna, as reviewer of the claims, is not responsible for payment of any benefits and, therefore, should be dismissed. Plaintiff filed no opposition to this argument.

Pursuant to 29 U.S.C.A. § 1132(a)(1)(B), a civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan. See 29 U.S.C.A. § 1132(a)(1)(B). Pursuant to 29 U.S.C.A. § 1132(d)(2), "[a]ny money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter." See 29 U.S.C.A. § 1132(d)(2).

Defendants state that the STD Plan specifically names Federal Express Corporation as the Plan Administrator. Defendants, however, provide no citation to the record. The

Court's review of the FedEx employee benefits handbook indicates that "[f]or some Plans, FedEx has delegated authority to an insurance company to administer benefit claims under the Plan." Further, "[s]ubject to the overall authority of the Plan Administrator, the claims-paying administrator has discretionary authority to interpret Plan provisions and determine benefit claims." According to the handbook, Federal Express Corporation is the named fiduciary, and its short-term disability plan is self-funded.

Without clear documentation specifying the Plan Administrator and how much discretionary authority is given to Aetna regarding the handling of short-term disability benefits for FedEx employees, there are incomplete facts regarding Aetna's responsibility. In Larson v. United Healthcare Ins. Co., 723 F.3d 905, 915 (7th Cir. 2013), the Circuit Court found that "nothing in ERISA categorically precludes a suit against an insurance company for benefits due under § 1132(a)(1)(B)." Further, "[a]lthough a claim for benefits ordinarily should be brought against the plan (because the plan normally owes the benefits), where the plaintiff alleges that she is a participant or beneficiary under an insurance-based ERISA plan and the insurance company decides all eligibility questions and owes the benefits, the insurer is a proper defendant in a suit for benefits due under § 1132(a)(1)(B)." Id. (stating that this

conclusion comports with Ninth Circuit law, as well as the general approach adopted by other circuits in benefits claims against nonplan defendants); see also Fisher v. Aetna Life Ins. Co., 890 F.Supp.2d 473, 475-76 (D.Del. 2012) (suit filed against Aetna although Bank of America was the employer but who delegated authority to Aetna "for purpose[s] of [1] reviewing denied claims under the Plan ... [2] hav[ing] discretionary authority to determine entitlement to Plan benefits ... and [3] constru[ing] the terms of the Plan.").

Therefore, given the incomplete facts in the record, and given that defendants' motion will be granted thereby effectively dismissing Aetna, this issue is moot and the Court will not reach the merits on this issue.

### 2. Preemption of State Law Claim

Defendants argue that ERISA preempts plaintiff's state law claim. Plaintiff filed no opposition to this argument.

"[T]he ERISA civil enforcement mechanism is one of those provisions with such 'extraordinary pre-emptive power' that it 'converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" Aetna Health Inc. v. Davila, 542 U.S. 200, 209, 124 S.Ct. 2488, 2496 (2004). Plaintiff's complaint has one count against defendants for failure to pay disability benefits. Following the removal of this case from state court, that count

was preempted by federal law upon a finding that this Court had jurisdiction under ERISA. Therefore, plaintiff's state law claim for denial of short-term disability benefits under an ERISA-regulated employee benefit plan had been preempted following removal, see id. at 210, and therefore, this argument is denied as moot.

**V.  CONCLUSION**

For the foregoing reasons, plaintiff's motion for summary judgment is denied, and defendants' motion for summary judgment is granted.

An Order will be entered consistent with this Opinion.


 s/ Noel L. Hillman
NOEL L. HILLMAN, U.S.D.J.


Camden, New Jersey


Date: December 31, 2013